1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTONIO C. GANS,                                    No. C 08-4676 SI (pr)

           Petitioner,                            **ORDER DENYING HABEAS**
                                                        **PETITION**
    v.

R. G. WONG, warden,

           Respondent.
_____/

## INTRODUCTION

    Antonio C. Gans, an inmate at the California State Prison-Solano, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition.[1] For the reasons discussed below, the petition will be denied.

## BACKGROUND

    Petitioner Gans was convicted in Contra Costa County Superior Court of second degree murder and residential burglary. The jury found that he used a deadly weapon in committing both offenses.

    The jury found Gans' co-defendant, Larry Graham, guilty of first degree murder and residential robbery. It found that he had used a deadly weapon as to the residential robbery, but

---

[1] After Respondent had filed his answer, and within the time as extended allowed for him to file a traverse, Petitioner filed a document on the court's form for section 2254 habeas petitions carrying the docket number of this case. It contains discussion of Petitioner's issues and clearly is responsive to the answer. It thus is a traverse, and is what is meant in this ruling by references to "traverse."

not the murder.  Graham was sentenced to prison for a term of twenty-six years, eight months, to life; Gans was sentenced to a term of seventeen years, four months, to life.

Gans' conviction was affirmed on appeal by the California Court of Appeal, but the sentences of both defendants were reversed and the case was remanded for re-sentencing.  (Ex. E (opinion of the California Court of Appeal) at 37.)[2]  The California Supreme Court denied Gans' petition for review of the affirmance of his conviction.  (Ex. F.)  It appears from a state habeas petition that Gans filed subsequent to his re-sentencing that the new sentence was fifteen years to life.  (Ex. G at 2.)

The court of appeal summarized the facts of the crime:

> Late in the evening of January 1, 2001, Anita Sabedra, then 16 years old, returned home with victim, Anthony Buccellato, to an apartment in Antioch she sometimes shared with three other people. After Buccellato entered the apartment with Sabedra, defendants Graham and Gans severely beat him with pliers and a flashlight and threw Buccellato into the bed of his pickup truck. Gans drove the truck onto Highway 4, where Graham pushed the victim's body onto the roadway. Several passing motorists struck the victim, mangling and dismembering his body.

(Ex. E at 2-12.)  Further details of the crime are set out below in the discussion of Petitioner's sufficiency of the evidence claim.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  See 28 U.S.C. § 1331.  This action is in the proper venue because the challenged action concerns a conviction obtained in Contra Costa County, which is in this district.  See 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state

---

[2] Citations to "Ex." are to the exhibits making up the record lodged with the court by the Attorney General.

1  judicial remedies, either on direct appeal or through collateral proceedings, by presenting the
2  highest state court available with a fair opportunity to rule on the merits of each and every claim
3  they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that
4  state court remedies were exhausted for the claims asserted in the petition.

5

6                                    **STANDARD OF REVIEW**

7          This court may entertain a petition for writ of habeas corpus "in behalf of a person in
8  custody pursuant to the judgment of a State court only on the ground that he is in custody in
9  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The
10 petition may not be granted with respect to any claim that was adjudicated on the merits in state
11 court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was
12 contrary to, or involved an unreasonable application of, clearly established Federal law, as
13 determined by the Supreme Court of the United States; or (2) resulted in a decision that was
14 based on an unreasonable determination of the facts in light of the evidence presented in the
15 State court proceeding."  28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362,
16 409-13 (2000).

17         "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court
18 arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or
19 if the state court decides a case differently than [the] Court has on a set of materially
20 indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

21         "Under the 'unreasonable application' clause, a federal habeas court may grant the writ
22 if the state court identifies the correct governing legal principle from [the] Court's decision but
23 unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal
24 habeas court may not issue the writ simply because that court concludes in its independent
25 judgment that the relevant state-court decision applied clearly established federal law
26 erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A
27 federal habeas court making the "unreasonable application" inquiry should ask whether the state
28 court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

**DISCUSSION**

As grounds for federal habeas relief, Gans contends (1) that his due process rights were violated by the trial court's giving a jury instructions that contained a mandatory presumption and lessened the prosecution's burden of proof; and (2) that there was insufficient evidence to support the second degree murder conviction.

A.      Jury Instruction

In his petition, Gans states his jury instruction claim as being:  "The Jury Instructions Violated Federal Constitutional Mandatory Presumptions Prohibitions."  As "Supporting Facts," he says:  "The trial court allowed and participated in the prosecution's less[en]ing its burden of proving petitioner's level of criminal culpability in the homicide by use of burden shifting presumptions, d[e]spite the actual innocence of petitioner."

Habeas corpus petitions must meet heightened pleading requirements.  McFarland v. Scott, 512 U.S. 849, 856 (1994).  An application for a federal writ of habeas corpus filed by a prisoner who is in state custody pursuant to a judgment of a state court must "specify all the grounds for relief which are available to the petitioner ... and shall set forth in summary form the facts supporting each of the grounds thus specified."  Rule 2(c) of the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  "'[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error.'"  Rule 4 Advisory Committee Notes (quoting Aubut v. Maine, 431 F.2d 688, 689 (1st Cir. 1970).  "Habeas petitions which appear on their face to be legally insufficient are subject to summary dismissal."  Calderon v. United States Dist. Court (Nicolaus), 98 F.3d 1102, 1108 (9th Cir. 1996) (Schroeder, J., concurring).

In presenting this claim in his petition, Petitioner does not state facts that point to a real possibility of constitutional error; indeed, he states no facts at all.  And even if the court were to consider his arguments in the traverse in an attempt to discern his point, but see Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (traverse not proper pleading to raise additional grounds for relief), what he says there would not change the outcome; in the traverse

4

he discusses cases having to do with mandatory presumptions, but never says what instruction in his case contained such a presumption.   (Trav. at 8-11.)  He does says that the instructions as a whole created a mandatory presumption that if he was present in the truck when the body was dumped, he was guilty of murder, but he does not point to or quote any instruction that says that, and the court has found none.  (<u>Id.</u>)

This claim is without merit.

B.      <u>Sufficiency of the Evidence</u>

Petitioner contends that the evidence was insufficient to convict him of second degree murder.

1.      <u>Evidence at Trial</u>

Petitioner does not dispute the description of the evidence at trial provided in the opinion of the court of appeal:

*Prosecution Case*

Sabedra agreed to testify at trial in exchange for entering guilty pleas to charges of voluntary manslaughter, carjacking, and robbery. She had known defendant Larry Graham, who lived across the street, for about a year. At the time, she was staying off and on in a two-bedroom apartment in Antioch with Robert Luttenberger, Carrie O'Brien, and defendant Antonio Gans. She shared a room with Luttenberger, whom she had met several months earlier. Sabedra had also known O'Brien and Gans for several months. Gans shared a room with O'Brien.

On the night of the murder, Sabedra, Graham, and Gans had planned to go "rooting" at a Pacific Bell lot in Oakland with the intent of stealing computers, cell phones, and pagers from Pacific Bell vans. Sabedra described "rooting," which she had done several times, as "going through other people's property without their knowledge." Graham had a key allowing access to the vans because he had recently worked for Pacific Bell. The three discussed their plans in the apartment at the kitchen table that evening. Sabedra wore dark clothes in anticipation of going rooting in Oakland. Graham had a duffle bag containing flashlights, duct tape, rope, and a screwdriver.

At around 10:00 p.m., Graham and Sabedra went to her mother's house to get a pair of gloves for Graham. They returned to the apartment and then walked with Gans toward the Bonfare Market to "take a car" to drive to Oakland. Upon arriving at the market, Sabedra approached the victim, Anthony Buccellato, and asked him for a cigarette. Buccellato, who was wearing a cowboy hat, asked Sabedra if she were a prostitute. She told him she was not and suggested he go to West 10th Street or the Willow Pass area in Concord. Sabedra then went into the store. While inside, she noticed that Buccellato had approached Graham and Gans

5

outside, but by the time she left the store they had finished their discussion.

Sabedra, Graham, and Gans then walked to the apartment of an acquaintance to get a car. They found the car, according to Sabedra, but they decided against using it to go rooting because it had no license plates and they were concerned about getting stopped by the police. The three then concocted a plan for Sabedra to ask Buccellato back to the apartment, where they would scare him into giving up his truck.  [FN1.  When first questioned by the police, Sabedra denied there was any plan to set Buccellato up for a robbery or to take his truck.] She assumed that Buccellato would agree to return home with her because he had already propositioned her. Sabedra returned to the Bonfare Market while Graham and Gans walked back to O'Brien's apartment. At the market, Sabedra chatted with Buccellato for around five minutes before asking him if he wanted to come over. He agreed and then he and Sabedra drove to O'Brien's apartment in his truck. On the way, Buccellato said he wanted oral sex for $15.

When they arrived at the apartment, Sabedra opened the door and Buccellato asked to use the bathroom. Then Graham and Gans jumped out and started beating Buccellato, who screamed and fought back. Graham had a pair of channel lock pliers and Gans had a flashlight. The two kept hitting the victim with the pliers and flashlight, but he would not go down. Scared and hoping to avoid seeing the fight, Sabedra retreated to O'Brien's bedroom and banged on the door. O'Brien, who was home at the time, let her into the bedroom.

After five minutes, Sabedra, along with O'Brien, returned to the living room. Buccellato was lying face down on the floor, with Graham standing over him and Gans nearby. Gans left to get some rope, and Graham took the flashlight Gans had been using. Gans told Graham to hit Buccellato if he got up. Every time the victim would twitch or moan, Graham hit him on the back of the head with the flashlight. Sabedra, who was "a little bit" upset by what she saw, told Graham to stop. After Gans returned with the rope, Graham tied Buccellato's hands behind his back. Graham also removed the victim's belt and used it to tie him up. According to Sabedra, Gans and Graham tied the victim's hands and feet with duct tape.

Graham searched through the victim's pockets and removed a wallet, keys, and money. He gave Sabedra the money, which was bloody, and told her to wash it.

Sabedra recalled the victim asking for water while he was lying face down on the floor. He also responded, "yes, sir" and "no, sir," when told they were going to get help for him. Sabedra and O'Brien told defendants to take the victim to the hospital. Gans agreed to take the victim to the hospital and backed Buccellato's truck up to the front door. Graham and Gans lifted the victim to his feet and cut the duct tape on his legs. Sabedra believed the victim could not stand on his own but had walked to the truck with Graham and Gans supporting him. After Sabedra heard the truck leave, she and O'Brien began to clean up the blood in the apartment. Gans returned in the early morning hours of January 2, 2001, and told Sabedra to call someone named "Crusty" and instruct him to have Graham call them. She complied and left a message with Crusty, informing him it was an emergency.

Carrie O'Brien agreed to testify at trial in exchange for pleading guilty to accessory to murder. On the evening of the murder, she took methamphetamine and drank at least two 40 ounce bottles of beer. At about 10:00 p.m., O'Brien

woke up as Gans was putting on gloves and holding a flashlight in the bedroom they shared. Gans told O'Brien they were going to beat up a man. O'Brien told him not to do it in her house.

O'Brien saw Sabedra pull up in a truck with an older man wearing a cowboy hat. She heard a male voice not belonging to Graham or Gans saying, "What are you doing? What are you doing?" She then heard a commotion and booming noises, like somebody was getting seriously hurt, and she turned up her stereo and her TV to block the noise. O'Brien estimated the beating lasted 10 to 15 minutes. Sabedra then knocked at the door and asked to be let in. When Sabedra entered, she looked scared and was holding money. O'Brien emerged from her room and saw Graham next to the victim, who was lying face down on the floor with duct tape around his hands and feet. Gans told O'Brien not to call the police or else he would kill her.

O'Brien confirmed that Gans pulled a truck up to the apartment and that defendants said they were taking the victim to the hospital. There was blood all over, and she and Sabedra started cleaning it up. Luttenberger returned to the apartment after defendants had left with Buccellato.

O'Brien testified that at around the time of the preliminary hearing she had run into Graham, who called her a snitch and that he was going to have someone "get her."

Witnesses from the neighborhood testified that they heard loud noises coming from O'Brien's apartment late in the evening on January 1, 2001. One heard loud music and sounds consistent with bodies moving around and bumping into walls for about 20 to 25 minutes. Another neighbor, who had heard moaning and beating noises coming from O'Brien's apartment, later saw Gans drive a truck up to the front door and put a rug in the truck bed. The neighbor then saw another man whom she identified at trial as Graham assist Gans with carrying what appeared to be a body wrapped in a blanket out to the truck. The neighbor testified that Gans and Graham threw the object up into the truck, where it landed with a "thump."

Motorists came across Buccellato's body on westbound Highway 4 in Contra Costa County shortly after midnight on January 2, 2001. The body was in the fast lane and initially appeared to be intact but not moving. It was fully clothed and either face down or on its side, with the arms tied behind the back. At least one driver pulled to the side of the road and called 911. When a driver and her passenger walked back to the scene after pulling over, the body appeared to have been run over and become mangled. An emergency medical technician on duty and driving on Highway 4 with his partner also saw the body and pulled over. They ran back to the scene, where they saw numerous cars hitting the body. The driver recalled that the body was lying on its back.

A police officer from Pittsburg arrived on the scene at around 12:30 a.m. after following two California Highway Patrol cars that were entering Highway 4 with their overhead lights and sirens on. The officer testified that the stretch of Highway 4 where the body was found was dark and that fog limited visibility to a few hundred feet. Another Pittsburg police officer who performed crime scene investigations placed placards next to pieces of evidence on the highway, including a cowboy hat, a seven foot by four foot rug, leather boots, a leather belt, a piece of gray duct tape with blood on both sides, a roll of duct tape with blood on it, a white nylon cord with knots on each end, and a comforter. A California

Highway Patrol officer who performs accident reconstruction testified that he arrived at the scene at about 5:45 a.m. He found a cowboy hat about 317 feet from the remains of the victim. A trail of blood tracked by vehicle tires was almost 70 feet long.

Kevin Krutzner, who had worked with Graham at Pacific Bell, also testified for the prosecution. Krutzner was a union steward and had tried to help Graham, who had poor attendance at work. Their work entailed picking up vans at a fenced-in yard at the Oakland Army base. Equipment was left overnight in the vans, including laptop computers and other electronics.

At about 5:30 a.m. on January 2, 2001, Krutzner responded to the doorbell and saw Graham at his doorstep. Krutzner had ended his relationship with Graham three or four weeks earlier, after Krutzner's wife discovered Graham in their garage. Graham told Krutzner he had been involved in an altercation and that he had a truck he did not know what to do with. Graham also said he had hit someone with a flashlight and showed Krutzner a gash on his own forehead. Krutzner told Graham that his wife had called the police-although she had not-and Graham left after their brief conversation. Krutzner later noticed he had received a cell phone message at around 3:10 a.m. from someone who identified herself as Anita. The caller said it was an emergency and left a callback number.

Police officers apprehended Graham after he knocked on the door of O'Brien's apartment on the evening on January 2, 2001. Officers were inside the apartment executing a search warrant when Graham arrived. Graham had in his possession the victim's prescription drugs, a key ring with the victim's name on it, and a blood-stained insurance certificate in the victim's name. In Graham's duffle bag, an officer found a flashlight, screwdriver, chisel, pliers, and a rope with reddish brown stains. In the victim's truck an Antioch police officer found a flashlight, tape, and pliers. The bulb of the flashlight was broken and the flashlight appeared to have red stains on it.

According to the forensic pathologist who performed the autopsy on Buccellato, some of Buccellato's injuries appeared to have been inflicted before vehicles hit the body, and some were characteristic of injuries suffered by someone who had been run over multiple times. All the victim's ribs and most of his long bones were fractured, and one of his limbs had basically been amputated. These injuries were consistent with being run over. Injuries that preceded vehicle impacts included numerous lacerations on the back of the scalp and on both sides of the head. Injuries on the victim's skull could have been administered by blows from tools such as a flashlight and pliers, according to the forensic pathologist. Buccellato also had defensive wounds on his hands and forearms, with lacerations so deep that tendons on his hand were protruding. The pre-impact wounds had developed bruising, indicating that the heart was beating for some period of time after the wounds were inflicted. The amount of blood on the victim's heavily bloodstained shirt was not consistent with bleeding from vehicle impact injuries. The forensic pathologist testified he could not determine whether death was caused by the pre-impact wounds or by the impact from the vehicles, although he opined that the pre-impact wounds could have been fatal.

*Defense Case-Gans*

Gans testified on his own behalf at trial. Although he acknowledged beating Buccellato, he denied intending to rob him or take his truck. Rather, he claimed to be enraged that an older man would treat 16-year old Sabedra like a "two-dollar whore." According to Gans, he took it upon himself to "punish"

Buccellato, but the plan to "rough him up" just went way too far.

Gans lived with O'Brien and had a romantic relationship with her. On the night of the murder, Gans, Graham, and Sabedra planned to go "rooting," which Gans understood to mean breaking into people's cars or robbing people in their homes. He had never been rooting before. After using methamphetamine, Gans walked to the Bonfare Market with Graham and Sabedra. While at the market, Gans saw Sabedra speaking to Buccellato but did not join in the conversation. Gans, Graham, and Sabedra then walked to the apartment of a friend to see if they could borrow a car. Graham went upstairs to the apartment by himself, leaving Sabedra and Gans on the street. While they were alone, Sabedra told Gans that Buccellato had "grabbed her ass and tried to buy her." Gans was upset because Buccellato was so much older than Sabedra and because he had treated her like a cheap prostitute.

The friend with the car was not home. It was cold and they chose to return home, having failed in their attempts to get a car to go rooting. Sabedra decided to go back to the Bonfare Market, explaining that she wanted to talk to Buccellato and bring him back to the apartment, although she did not say why she intended to bring him home. Gans, who was upset because he had feelings for Sabedra, pleaded with her not to bring Buccellato back to the apartment. He and Graham returned to O'Brien's apartment.

Gans went to his bedroom in the apartment, where O'Brien was either asleep or passed out on the bed. A loud vehicle pulled up, and Gans saw two people get out, including Buccellato, whom Gans recognized from the Bonfare Market by his cowboy hat. Gans knew he was about to get into a fight and put on gloves to protect his hands. After Buccellato entered the apartment and asked for directions to the bathroom, Gans asked the victim in a raised voice what he was doing there. Punches started flying, although Gans could not recall who threw the first punch. Gans picked up a flashlight after 45 seconds to a minute, believing he had underestimated Buccellato. He testified he "saw red" and "lost it for a minute." He did not recall exactly what Graham was doing but he believed that Graham had a wrench or something like it. They eventually stopped hitting Buccellato, when he was on the floor. Gans told Buccellato that Sabedra "was only 16 years old and next time don't think with [your] dick."

Gans went back to his bedroom, where O'Brien was upset and crying. She wanted Gans to take Buccellato to the hospital. The victim had also asked to be taken to the hospital, saying that his head hurt. When Gans returned to the living room, the victim was taped up and there was a pool of blood on the floor. Gans could not remember whether he told Graham to tie up the victim. While Buccellato was lying on the floor, Graham asked to use Gans's knife to kill Buccellato. Gans refused, saying he did not want to see anyone killed in the house in front of Sabedra and O'Brien.

Gans told Buccellato he was taking him to John Muir Hospital. He picked up the victim's car keys off the floor and pulled the victim's truck up to the front door. Gans put a rug in the bed of the truck. He claimed he did not want to put the victim in the cab because he thought Buccellato would not want blood in his truck. He cut the tape off the victim's legs, put a comforter around him, and put him in the bed of the truck with Graham's assistance. He did not know if the victim was dead or alive when he was carried to the truck.

9

After Gans closed the tailgate, he returned to the apartment and asked Sabedra to go with him. However, O'Brien wanted Sabedra to stay behind, and she complied. Gans did not know where Graham was but thought he was in the house. He did not want Graham to accompany him because he felt Graham was "out of control."

Gans then drove in Buccellato's truck toward John Muir Hospital on Highway 4. He admitted he knew that Sutter Delta Hospital was much closer, but he claimed he decided to go to John Muir because it has a trauma center and is "the better hospital." He had been to Sutter Delta Hospital for medical treatment in the past but claimed he was not "happy with the service" there. He admitted he had never been to John Muir Hospital for any significant treatment himself.

While Gans was driving on Highway 4 to John Muir Hospital, he heard a knock on the rear window of the truck's cab but did not look back because he was focusing on the road. When he heard another knock a minute later, he called to the victim that he was getting to the hospital as fast as he could. Then, after hearing a loud bang on the rear window, he pulled the truck over to the side of the road. Someone jumped out of the truck bed and approached the passenger door. It was Graham. Gans claimed he thought Graham had stayed back at the apartment with Sabedra and O'Brien. Graham told Gans that the victim was no longer in the truck. Upset with Graham, Gans exited the highway, drove back to Antioch, and got out at a burger restaurant. Graham took the truck, and Gans returned back to the house, where he told Sabedra what happened.

When police officers interviewed Gans on January 2, 2001, Gans initially denied any involvement in Buccellato's death. He ultimately admitted his involvement, telling police he hit the victim because Buccellato had said something to Sabedra he did not like, although he refused to say what Buccellato said that angered him. He told police he did not feel bad about beating the victim, and he told them Graham had used Sabedra as bait. At trial, Gans testified he did not know how a pen and a knife, which presumably came from Buccellato's truck, ended up in his pocket, and he denied putting a pliers, flashlight, and duct tape in Buccellato's truck.

Several prostitutes reported that they had been picked up by Buccellato in the Willow Pass area and that he was well known and well liked. He was known to seek out younger prostitutes.

*Defense Case-Graham*

Graham testified on his own behalf at trial. Near the beginning of his testimony, Graham mentioned that his father was on death row for raping, sodomizing, and killing a young girl.

Contradicting the testimony of Gans and Sabedra, Graham denied there was any plan to go "rooting" on the night of January 1, 2001. However, like the other witnesses, Graham said he walked with Sabedra and Gans to the Bonfare Market between 10:00 p.m. and 11:00 p.m. He was going there to buy cigarettes and Gatorade. At the market, he saw an acquaintance and paid him back a $2 or $3 debt. While he was in the store, Sabedra approached him and said "something [had] happened," and she asked him to talk to Gans about it. Graham walked outside and saw Gans standing near Buccellato, whom Graham described as a "pretty big guy" with a cowboy hat. Graham overheard Buccellato say, "I love young pussy," and that he liked Antioch because it was poor and "there's grass on the field, and I can play ball."

The group walked to the apartment of Graham's friend, Gail, where Graham intended to visit with Gail. Gans and Sabedra waited outside while Graham went up to see Gail, but Gail was not home. Graham explained at trial that Gans and Sabedra waited while he went up to the apartment because he did not want Gans and Sabedra to come up unless Gail approved. The group then started walking back to O'Brien's apartment. On the way there, Sabedra went off on her own for reasons unknown to Graham. She said she would meet them later at O'Brien's apartment. Upon returning to O'Brien's apartment, Graham sat on the living room couch and Gans went to the back bedroom.

Graham heard a vehicle drive up and then saw Sabedra walk in with the man from the Bonfare Market. Gans confronted Buccellato and the two began fighting. Graham joined in. At trial, Graham explained he got involved in the fight because he did not want them fighting in the house and because he felt Buccellato was a sexual predator. He assumed Buccellato was there to have sex with Sabedra, and he was concerned about Sabedra, whom he called his "sister."

Graham testified that Buccellato had no weapons of any kind but that Gans had a flashlight and he had a pair of channel lock pliers, which he used to strike Buccellato. Graham admitted he hit the victim hard enough to fracture his skull, explaining that all he could think was that Buccellato was a sexual predator, like his father, that preys on young girls. However, Graham denied any intention to kill Buccellato or to take his wallet. He testified he did not take any property from the victim and does not know who took the victim's money, although he acknowledged he took some items from the victim's truck.

After Graham tied the victim up with rope and duct tape, he went to the bathroom because his head had been hit and he felt numb and dizzy. When he emerged from the bathroom, the front door was open. The victim was lying on the kitchen floor but nobody else was around.

Then Gans, who had pulled Buccellato's truck up to the front door, entered the apartment. Graham claimed he did not know until then that Buccellato had a pickup. Gans and Graham agreed to take Buccellato to the hospital, but according to Graham, neither Sabedra nor O'Brien was involved in that discussion. Graham tied a flannel shirt around the victim's head because it was bleeding and Buccellato looked badly hurt. The victim could not walk, so Graham picked up the top half of his body, and Gans took his feet. They put him on a carpet and carried it, horizontally, out to the truck. Graham was in the bed of the truck with Buccellato when Gans closed the tailgate. Gans went back into the apartment and came back with something that he put into the bed of the truck with Graham. Graham thought it was the victim's belt or hat. According to Graham, the victim was not talking when they left the apartment, and he never asked to be taken to the hospital. Like Gans, Graham claimed he knew that Sutter Delta Hospital was close by, but they decided to take the victim to the more distant John Muir Hospital instead.

Graham stayed in the bed of the truck to "secure" the victim and to make sure he was okay. As they were driving on the highway, Graham checked Buccellato and found he was not breathing and had no pulse. In a "panic," he pushed the victim away from him, towards the tailgate of the truck. He started hitting the window of the cab but Gans did not respond. Graham crawled to the back of the truck, unlatched the tailgate, and pushed the victim out onto the highway. Graham pounded on the rear window until Gans finally pulled over.

11

When the truck came to a stop, he told Gans that Buccellato had died so he pushed him off the truck.

Gans and Graham then drove to a restaurant, where Gans got out of the truck. Graham told Gans to tell Sabedra that he was going to Kevin Krutzner's house and to call him there. He referred to Krutzner as "Crusty." Then Graham drove to Danville, where Krutzner lived, arriving about 5:30 a.m. He returned to O'Brien's apartment later that morning.

Graham admitted he initially lied to police about his involvement in the crime, but he claimed he was not under oath at the time. He denied calling O'Brien a snitch or that he would "get her." He also denied ever asking for Gans's knife after Buccellato had been subdued, and he denied any intent to kill Buccellato in O'Brien's apartment.

(Ex. E at 2-12.)

2.    Standard for Constitutional Sufficiency of the Evidence Claims

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, id. at 324.  The federal court determines only whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319.  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  Id. at 324.

3.    Analysis

In its opinion in this case, the California Court of Appeal set out California law regarding the malice element of second degree murder:

Murder is the "unlawful killing of a human being ... with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) It is express when the defendant manifests "a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." ( Ibid.) Unlike first degree murder (other than felony murder), second degree murder does not require the intent to kill. (§ 189.) Instead, malice

12

1   sufficient to support a second degree murder conviction may be implied when a
2   person engages in an inherently dangerous act with a conscious disregard for
    human life. (See People v. Lasko (2000) 23 Cal.4th 101, 107.)

3   (Ex. E at 25.)  This statement of California law by the court of appeal in its opinion in this case

4   is binding on this court.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (state court's

5   interpretation of state law, including one announced on direct appeal of the challenged

6   conviction, binds a federal court sitting in habeas corpus).

7          When considering a sufficiency of the evidence claim the court must "view[] the evidence

8   in the light most favorable to the prosecution," Jackson, 443 U.S. at 319, so here it must assume

9   that the jury believed the prosecution's witnesses.  A rational trier of fact could have found the

10  essential elements of the crime beyond a reasonable doubt, based on  the  evidence that

11  Petitioner participated in the scheme to lure the victim to the apartment and beat him with a

12  flashlight in what he conceded was a rage, inflicting injuries that the medical examiner

13  considered to be life-threatening; or that the entire enterprise, from luring the victim to the

14  apartment to Graham's pushing him out of the back of the truck into traffic, was one inherently

15  dangerous act, undertaken with a reckless disregard for human life.  Or the jury could have

16  disbelieved Petitioner's claim that he was taking the victim to the hospital, and was only on

17  Highway 4 because he felt that the distant John Muir was a better hospital than the close-by

18  Sutter; the jury could instead have believed that because the victim would have been able to

19  identify the participants and identify the apartment, Gans and Graham never had any intention

20  of leaving him alive, but instead intended to do just what they did do, beat him unconscious and

21  then throw him from the truck into traffic in the hope that the resulting mutilation of the body

22  would prevent identification, or at least leave no link to them.

23         The claim that the evidence was constitutionally insufficient is without merit.

24

25

26

27  ///

28  ///

## CONCLUSION

For the foregoing reasons, the petition is denied.  The clerk shall close the file.

**IT IS SO ORDERED.**

DATED: April 22, 2010

_____
SUSAN ILLSTON
United States District Judge